We have one other argument today. All the other regular argument calendar items are on submission. We have one bail argument, and that's in United States v. Cincinelli. So let me just make sure counsel is here. Mr. Koussouris, you're here for Ms. Cincinelli, is that correct? I am. Good morning, your honors. Okay. Good morning. And Mr. Bagnola, am I saying that right? It's pronounced Bagnola, but I'm here. Thank you, your honor. Bagnola. Okay. On the other side, Nardini would give you a hard time, probably, with that pronunciation. But we'll go with the American version. Same with Cincinelli. All right. Well, if we have time, we can do Nardini's rebuttal on pronunciations. But for now, I guess we've got five minutes per side. But Mr. Koussouris wanted to reserve one of those minutes for rebuttal. Okay. So, Mr. Koussouris, you may proceed. Thank you. May it please the court, I represent Valerie Cincinelli. On this appeal of a bail determination, and it is my hope that during this proceeding, this court will be left with a definite and firm conviction that a mistake has been committed on the issue of whether Ms. Cincinelli should be detained or granted bail. In the lower court, we respectfully submit that the court erroneously decided, from a legal perspective and a factual perspective, several things that impact this analysis and should, I hope, leave this court with that impression. The court erroneously held that the newly discovered evidence provided by the government in the last two months was of no value and that we essentially were in the same position we were when we made our initial bail application. We disagree, and we think that the facts speak for themselves. This was a flawed assessment of this newly discovered evidence, and the embracing of the government's view that this evidence is nothing more than an attack on Mr. DeRuba's credibility is wrong on its face. We received, what's wrong, as the court is aware, Ms. Cincinelli is charged with murder for hire under 1958, which specifically requires, as an element, remuneration. The government's claim is that Ms. Cincinelli withdrew $7,000 from her bank in February, gave it to Mr. DeRuba, who then bought gold worth less than $7,000, and turned the gold over to a hitman, all of this, of course, being a fiction because it never existed. In our initial bail application, which is very different from what we have here, we cited what we had, and what we had not only was a two-year course of action by Mr. DeRuba, literally, to ruin Ms. Cincinelli in conjunction with other people who were associated with her ex-husband, Mr. Carvalho, we cited, for example, a text that was more general in nature, to which I wish I had the money right now to come over and give you, I really do, but I don't, and I have to suffer it for the poor decisions that I've made, please don't judge me. Now, that indicated to us, and we proffered to the court, that that's DeRuba. By the way, in April of 2019, a couple of weeks before he went to the federal authorities, and three months after it all began, according to him, that is a general statement, I owe you money, I wish I had it. When the government turned over DeRuba's phone, and we began our analysis of it, we have this text, I understand the $800, but you lent me seven grand for coins. This evidence is not Giglio, well, it's Giglio to the extent that he'd be confronted with it when he testified to something to the contrary, but it is absolute Brady material that should have been turned over immediately, but it absolutely negates the element of remuneration in 1958. With this evidence, and all of the other evidence that we have cited, which many, much of it is Giglio material, the government's case on the 1958, on the element of remuneration is gutted, in our view. The court also stated that the weight of the evidence was not the only thing that the court was considering, and yet, when you look at the other factors in 3142, you look at her personal history, a 12-year veteran of the police department with no history of violence, lifelong community ties, a bail package of over $1 million secured by properties, living with her father, who is a retired lieutenant in the NYPD. There is absolutely no indication from the other factors to be considered under 3142 that would militate against the granting of the bail with the strict conditions that we have put forward. There's really no question that the plethora of evidence, and now including this newly provided evidence, makes very clear that the murder for hire charges here with respect to the element of remuneration simply cannot be proven, or at a minimum, your honors, it is a change in circumstances concerning the weight of the evidence that should be considered. If she didn't pay him to hire a hitman, then this affects the entire analysis with respect to danger. If she didn't pay him for a hitman, and she did not, then she had no intention that any harm would befall anyone. So categorizing it of no value, saying that there's nothing different from the initial application, essentially minimizing 3142 G2 by stating, save it for the jury, it was, in our view, legally erroneous. There's only one permissible view of this evidence, and that is, is that it is exculpatory and negates the element of remuneration. We have also made our arguments, and I know I'm running close to the one minute, if not past it, with respect to the Sixth Amendment claim. And I just wish to point out there that the reason that we asked for the adjournment was because we had just received multiple terabytes of discovery that we needed to review with Ms. Cincinnati. The pandemic hit, the entire BOP suspended all contact with attorneys. We have not been able to visit with her. We finally, after a month, arranged a video conference last week. The video feed did not work. But even if we had video conferences for 30 minutes, our ability to meet face-to-face with Ms. Cincinnati, review these texts, and your honors, there's so much context here. It's not just a matter of picking out good texts and presenting them to the jury. This is a story that went on for over two years. Our ability to prepare is completely suspended. And when the pandemic is over, we then will be meeting with her and will need additional time. So there'll be an additional delay for trial. And also, we have to remember Judge Feierstein basically saying, stand in line. Understandably, there are many other cases and a backlog that has been created. But we did not precipitate this difference with regard to our ability to prepare. Had we had this evidence in June when it was promised, we would have spent nine months reviewing it. And perhaps, perhaps, a different argument could be made. We now have been told that the BOP has instituted a 24-hour lockdown. I have a police officer in the midst of this crisis and all that's going on in the wake of the Floyd murder in BOP being looked at, shall we say, negatively, again, under complete lockdown. I submit respectfully that there is a mistake that was made here. Miss Cincinnelli should be granted bail under these circumstances. All right. Thank you, Mr. Casares. And I hear from Mr. Bagnolo. Thank you, Your Honor. And may it please the Court, this is Anthony Bagnolo for the United States. The District Court's evaluation of evidence that's susceptible to more than one meaning cannot be clear error. The record in this case makes clear that the District Court undertook an independent review of the defendant's proper evidence, analyzed it under the Bail Reform Act multi-part test, and twice found it insufficient based on all the facts and circumstances to justify pretrial release. Moreover, the District Court properly found that the NVC's modified operations are reasonable in light of the pandemic, and that the defendant has no trial date or other circumstance that would make her uniquely impacted by those modified operations. The denial of her Sixth Amendment claims was also not a clear error. With respect to the evidence that the defendant claims gutted the murder for hire claim, it's worth noting that at best, that evidence places in dispute the element of murder for hire that bears least on the question of dangerousness. The District Court's dangerousness finding largely reflects its assessment of the evidence regarding the intended murder, none of which is placed in dispute by this motion. It's not disputed that the defendant was recorded on multiple occasions plainly talking about having two people murdered, one of whom was a 14-year-old girl. It's not disputed that the defendant appears on video deleting incriminating evidence, which itself is a charged offense here. It's not disputed that the defendant was recorded discussing her alibi, discussing ways to make the murder of her husband look like a robbery gone bad, or that in April of 2019, the defendant was researching online how the death of her husband would impact his standing to receive a portion of her pension in their divorce. In other words, Your Honors, the District Court had ample evidence from which to conclude that even if the defendant disputed the payment piece, she's still dangerous. And importantly, for present purposes, Your Honors, the District Court considered evidence of payment that's not at all addressed, let alone disputed by the defendant's current motion. I'll direct the court to page 19 of the government's appendix, which is a transcript of the June 17, 2019 motion argument, where counsel for the government specifically noted that video recording captured the defendant and Deruva discussing an additional $3,000. Counsel argued that it defied logic to be discussing, quote, another $3,000 if some initial payment hadn't already been made. In that regard, Your Honors, Judge Feuerstein reviewed the audio and video recordings herself in connection with the initial bail motion. Those recordings contain other evidence that have nothing to do with this $7,000 that the defendant seeks to put in dispute here. In a recording from May 13, the defendant asks Deruva if the reason the murder hadn't occurred yet is, quote, because you didn't pay him. In a recording from May 17, a Friday, Deruva tells the defendant the hitman demanded another $3,000, to which the defendant asked, quote, doesn't he know Saturday you're getting all your money? Again, the District Court had ample evidence from which to conclude that the defendant understood money would be exchanged for the commission of the murder. And the handful of text messages relied upon by the defendant does not suffice to materially alter that conclusion. The District Court considered all the evidence together and found that on balance, the evidence of dangerousness weighed in favor of detention. Unless the court has any remaining questions from me, either in this regard or with respect to the Sixth Amendment piece, the government will rest on its submission. All right. Thank you, Mr. Begumila. We'll now hear from Mr. Koussouris for a minute of rebuttal. Yes, Your Honor, I just cut out. Can everybody hear me? I can, certainly. Okay. Your Honors, let's be clear. The conversations that are cited by the government are not as put forward. And actually, if you listen to the conversations, they clearly show the opposite. Deruva is walking around the house talking. Every time he talks about money, there's one instance where he's talking about, hey, this guy wants an additional $3,000. The fact of the matter is, Ms. Cincinnati says nothing. This is an instance where Ms. Cincinnati, if the government were correct in its assertions, would be saying, what are you talking about? I gave you $7,000 for this guy. There's absolutely none of that. Your Honors, what happened here, you have conversations between Deruva and Cincinnati that are orchestrated by Deruva after two years of his doing everything he can to ruin her, along with her ex-husband and along with the other people involved here. The final conversation, the one the government doesn't speak about, is the one that really tells the story here, and the one that really shows that this is nothing but words of somebody who has been manipulated and angered for two years. What happens is, they stage the murder. Detectives walk into the house with a photograph and basically say that your husband has been murdered. Ms. Cincinnati begins crying hysterically. The detectives leave. At that point, Deruva takes a chance with his final salvo, and it is at this point that Ms. Cincinnati would be expected to seal her fate. He turns to her and says, why are you crying? You knew this was going to happen. And she's crying hysterically and repeatedly says to him, I never believe you. You always effing lie to me, repeatedly saying that to him. What happened here was, yes, you have conversations. She is clearly angry. But in the final analysis, if you look at all of the text messages, if you look at the fact that he literally gives her a list of his debts, think about it. This is February, March, and April. If these two individuals are conspiring to murder two people, why would he be texting her constantly, please let me back into the house. I know I owe you money. I will pay you. This is not what would be going on if, in fact, Valerie Cincinnati had any intention of having anybody killed or paid him to have anybody killed. There are so many of these. And then two weeks before he goes to the federal authorities because she has absolutely kicked him out of the house, which also is so incongruous to all of this, he sends her a text which specifically says I know I owe you $7,000 for the gold coins. And parenthetically, gold coins that he bought with this $7,000 after months before taking money from her and buying gold coins. He paid her back this time, and then he was accused of stealing a $50,000 diamond from the same person that he bought the gold coins from. There are angry words here. We have said that from the very beginning, but never once have we implied or acknowledged in any way, shape, or form a $7,000 payment for a hitman. And Daruba constantly, repeatedly, time and time again, makes very clear that the money that she withdrew from the bank in February and gave him was to buy gold coins. I mean, aside from the fact that the entire story is just, it makes no sense that a hitman would want gold instead of the money and he'd want it for less. There's no question that this was a loan, and it does impact danger because what it means is that this case is about words. It is about angry words without any intention, without any intent to harm anybody. Valerie Cincinnati never threatened either of these victims, never reached out to either of these victims. This is Daruba orchestrating these conversations. There is no murder for hire here. And the government just doesn't acknowledge or is called upon to acknowledge that this is braiding material. All right. All right. We have your arguments. Thanks very much, Mr. Kuceras, Mr. Bagnola. We will reserve decision.